this afternoon. The first case is No. 24-10102, United States of America v. Mandis Charles Barrow. We will hear first from Mr. Elza. Thank you, and may it please the court, counsel. My name is Slater Elza. I work with the Underwood Law Firm in Amarillo, Texas. I was appointed to represent Mr. Barrow at trial and continuing through the appeal of this matter. As the court knows, Mr. Barrow was charged in a superseding indictment with three charges, a conspiracy to distribute methamphetamine, count two distribution of methamphetamine, which will be referred to as the Amarillo arrest, and possession with intent to distribute 500 grams or more of methamphetamine, which will be referred to as the Rome, Texas arrest. After jury trial, Mr. Barrow was found guilty on all three counts and was subsequently sentenced to life in prison. This court should reverse the trial court for three separate reasons. The court erred in denying Mr. Barrow's motion to suppress. Two, Mr. Barrow was denied a fair trial when the evidence of the Rome arrest was admitted to include in the trial related to the Amarillo arrest. Three, the court erred in finding that Defendant Saldana's change in tactics during closing argument to argue a theory of the case that was exclusive and irreconcilable with Mr. Barrow. Again, as the court is aware, Mr. Barrow filed a motion to suppress which was denied. We recognize and acknowledge the standard of review, which is clear error as it relates to factual findings and de novo on the legal issues. Understand that that is an extremely high standard on the factual parts, but we believe that we are correct on those points. Importantly, and as I informed counsel before our start this morning, Mr. Barrow will concede that there was a lawful basis for the initial stop. Despite some of the concerning factual parts of that, from a legal perspective, we do not intend to pursue that and we will focus instead on the extension of that stop. The law tells us, and it's a well settled law, that after the initial inquiries and a traffic stop are complete, the legal basis for that stop expires and without further reasonable suspicion of additional criminal activities based on articulable facts. Facts becoming the most important word. The timeline, we believe, is crucial and has been set forth and discussed in both of the briefs, or in all of the briefs, by both sides today. But importantly, from that timeline, that in less than a minute of the stop, the insurance card, we'll start with this, again as the court will notice, there was a mistake in typing in a license plate number which came back to a different vehicle and a different vehicle with no insurance. However, in less than a minute, the officer approached the vehicle and was provided with a valid insurance card that confirmed the owner and the type of vehicle that had been pulled over. The officer was very clear that his regular practice would be to rerun the license plate. There's been some talk about whether Mr. Barrow was trying to hold the officer to a looking back standard on what he might have done or could have done, but those were his words, that he would normally have rerun that license plate and that becomes important as we move forward. After he was provided with the valid insurance card, he decided that obviously there was a discrepancy and instead of rerunning it, he chose a different path to investigate. He decided to run the VIN number. He ran that VIN number three times. Each of those three times, including within three minutes, at four and a half minutes, and at five minutes and twenty-four seconds of the stop, he got information that confirmed that what he was seeing with the car and what he was seeing on the insurance card were valid. And by five minutes and forty-eight seconds into the stop, he had cleared the warrant. So now becomes the threshold issue that we are looking at here today, and that is, did he have at that point a basis to extend the stop? And when you look at the briefing in this, we kind of talk about up to this point and then we talk about what happened at fifteen minutes and then at sixteen minutes. And what happened at sixteen minutes I don't think really deals with my issue here today. That specifically is when the occupant slash owner of the vehicle told a lie about her prior employment or her current employment, depending on how you want to look at that. But what we have to focus on is that five minutes and forty-eight seconds and why is that important. That is important to Mr. Barrow and to this court because at that point in time, the officer had access to all of the information he needed to resolve that stop. That he chose not to or forgot to do one other thing is really not the issue because what we have here is from five minutes and forty-eight seconds all the way until fifteen minutes, this idea of why are we prolonged. He did absolutely no investigation of the insurance issue, which was the only issue at that point in time and we think that the law does not allow somebody to simply stop an investigation, let that time continue to run until they come across something else. During that period of time, several things do happen after the five minutes and forty-eight seconds and those are some of the issues that we saw discussed in the press and that we see discussed throughout the briefing of the government. We see a discussion of terrible weather and this was about eight days after the polar vortex started in Texas. But the court has access to the videos. You can see the videos. You see the streets. You see the roads. You see the parking lots. There is no moisture on them. You see the officer standing out and about for well over an hour. You see talk of evading, which involves about a quarter of a mile, very slow, with the blinker on, turn into the closest business, which even the officer testified to as being reasonable. You have the discussion very related to that of traveling from one gas station to another gas station, but that is not what happened. What happens is they left one gas station and it is described different ways at different times. They headed towards a gas station. Well, on some level, any way you turn, you are going to head towards a gas station. As they went over that overpass, they got down to the only business that was there and that was lighted. The short duration of the trip was . . . That was within the five minutes and forty-eight seconds? I am sorry? They had the discussion about . . . well, when they had the discussion about why they moved from one gas station to the other, that was within the five minutes and forty-eight seconds or after the five minutes and forty-eight seconds? That was after. If I have got my timeline right, that would be after because she was already out of the car at that point when she was talking about that. So she did not get out of the car until the five minutes and forty-eight seconds mark? Yes, ma'am. And there was talk in the order denying the motion to suppress about the developing inconsistencies I believe were the exact words that were used. But what we know is that what the officer was seeing and doing and working with that night is his own words were that the stories of the two jived. Jive being a word that they performed, not that they were differing. And then finally, very importantly, it was extremely important to the officer as a former police officer in Fort Worth that the address of Mr. Barrow was in what he thought was the stop six. He said the roughest part of town and that was important to him because it is a part of town with drug dealing. He later confessed under oath that he was mistaken and that the address that Mr. Barrow was living at was in fact, I am sorry, far to the west of the stop six area. So when we look at those topics and we look at in the order, the nine through twelve that the judge referred to, those all happened after the five minutes and forty-eight seconds. So we believe it is very important that the purpose for the stop had resolved without the development of any articulable facts. Second, I would like to address the allegation in the government's briefing that Mr. Barrow waived his argument that the evidence from the Rome stop tainted the other two convictions and that that was waived. What they essentially say, if I understand, is that we should have continued to object and argued to have that evidence excluded or separated into a different trial. However, with the ruling on the suppression motion, we were told repeatedly that that issue had been resolved and it was not to be brought up again. But more importantly, there was a conspiracy account. I had no basis to argue that it was not relevant or that it was prejudicial. I mean, it was part of the other charged count in count one. And so I'm not allowed, through my ethical obligations, to present arguments that do not have a legal or factual basis to do so. We believe that the issue was preserved and that it was, in fact, prejudicial. The government secondarily argues that there was no spillover, which cannot be true when it was, as I stated just previously, that the Rome arrest was part of the conspiracy count. The suppression ruling was very, very important because it absolutely affected our strategy, who we called to testify, and whether my client could testify. We believe the law is well settled, that the government is prohibited from making derivative use of evidence that should have been suppressed. Finally, as to what we called, in conformance with the trial judge, the Bruton issue, which the government has perhaps correctly identified more of, more properly as an antagonistic defense claim, but the issues are the same in the way that the court approached these. As this happened, which is important, was after the government's closing, after our closing, and then with the co-defendant's closing, at the end of that closing, everything that had been discussed with the court as we had addressed this issue moving forward suddenly changed. Ms. Saldana, through her counsel, changed tactics and absolutely made statements that she did not know about it, but he knew that he was trafficking and that he had put her in danger. The court took this up immediately and ruled on it, which I believe is our obligation is to make sure that there was a ruling. The government seems to take the position that we should have objected to the ruling, which again, I believe once there's a ruling, that matter is and has been resolved, but secondarily on this point, the argument of the government is that there really is not an antagonistic defense claim, which we believe is untrue for this reason. They point out that Mr. Barrow argued, related to the credibility of the officers, and that she simply argued that she had no knowledge of the drugs and that those can be compatible, except that's not what she argued. She didn't just argue that she didn't have knowledge. She argued that he was a drug dealer, that he had placed the drugs there, that he was transporting the drugs, and that he had put her in danger, much more than simply saying that she did not have knowledge that they were there. We believe this constituted a significant infringement of his constitutional rights as we were not even able to respond to that argument because our time had passed. Thank you. Thank you, Mr. Elza. You've saved time for rebuttal. We'll hear next from Mr. Gordon on behalf of the United States. May it please the Court, Daniel Gordon for the United States. This Court and the United States Supreme Court have repeatedly held that the touchstone of a Fourth Amendment analysis is reasonableness. Here, the parties agree that Officer Moore had a reasonable basis to stop the Camaro, but he also had a reasonable basis to extend that stop after he developed reasonable suspicion early on in that stop that there were drugs in the Camaro. Viewing the facts and the like most favorable to the government, this Court should affirm the district court's denial of Barrow's suppression motion. It should also reject Barrow's two unpreserved, meritless trial claims. I'll turn first to the suppression issue, specifically to opposing counsel's argument, which seems to be the crux of the argument today, whether or not Officer Moore should have ended the stop around the six-minute mark. And the answer to that question is no. And there are a few reasons why. First, by six minutes into the stop, Officer Moore had not dispelled his reasonable belief that the Camaro lacked a front license, excuse me, that the Camaro did not have insurance. And there are a few reasons for that, Your Honors. First, the license plate check that he ran indicated that the license was canceled out of Fort Worth, the same place where the defendant indicated that he lived. Second, Officer Moore testified at the suppression hearing that it is not uncommon in drug trafficking cases for an individual to do what's called a VIN flip or a license plate change, meaning that they change out the VIN, they change out the license plate in order to not be detected by law enforcement. So, in fact, having the different results here, having the VIN check and the license plate check not match each other, that conflict heightened Officer Moore's suspicions that there may be something, that there may be criminal activity here. And that's on all fours with this Court's en banc decision in United States versus De Leon-Reyna, where this Court found that a, and it called it a switcheroo, a switcheroo where the defendant changes out the license plate or changes out the VIN check, that that is something that a reasonable officer with years of experience, here Officer Moore had 23 years of experience, 12 years in Fort Worth, that he may have found that suspicious, that there was a potential VIN flip or a license plate change here. And because of that, Your Honors, he had a reasonable basis to continue to investigate whether or not the Camaro had insurance. But there's... When did the officer dispel his concern that there was a VIN flip? What would be your time stamp for that? Your Honor, he did not. During the course of the stop, and that was Officer Moore's testimony at the suppression hearing, he never dispelled that suspicion until the end of the stop when he was filling out his report and realized at that point that he had mis-entered the license plate information. But he stops talking about it with Saldana around the 15-minute mark, and it's not like he ever goes back to talk about it with Barrett. That's true, Your Honor, and there's a reason why. My second reason of why by six minutes Officer Moore had a legal basis to extend the stop is because by that time, he had reasonable suspicion that criminal activity was afoot. He testified at the suppression hearing... Had that been cured by him rerunning the numbers? No, it had not been cured in terms of... Could it have been cured by him just rerunning the numbers? Could the insurance issue have been cured? Sure, Your Honors. We don't dispute that the insurance issue could have been cured if he had rerun the license plate. There are other reasonable things he could have done, though. He could have spoken to the driver and to the passenger in the car. That's exactly what he did. It's not this Court's role to post-talk, say what the officer should have done. It's this Court's role to say, was it reasonable? And here, Officer Moore testified, and again, this is at ROA 619 and 679, that within four minutes into the stop, he had developed reasonable suspicion, aside from the insurance issue, that there was criminal activity afoot. And here's the factors that he had at that point. The Camaro was driving on the day after one of the biggest snowstorms in Texas history in over 100 years. A sports car, which was ill-equipped to drive from Amarillo to Fort Worth and back to Amarillo, Officer Moore testified, that's around five hours each way in such poor weather conditions. In addition to that, when Officer Moore followed the Camaro out of the Big Z parking lot, the Camaro failed to immediately pull over, and instead it drove for another minute or so all the way to another gas station, which Officer Moore testified at the suppression hearing, based on his years of experience, that when an individual drives from one gas station to another, it doesn't immediately pull over when they have an opportunity to do so. And Your Honors, I would direct the Court to Governments Exhibit 1 and 3, which is the body camera footage in this case, so that you can see exactly what I'm talking about. But he testified at that suppression hearing that when a car travels in that way, it raises his suspicion that maybe the car's trying to see if maybe the police officer isn't going to follow them all the way there. Also, Officer Moore, at this point, less than six minutes into the stop, has noticed Stephanie Saldana, the passenger's, odd behavior in the stop. He testified at the suppression hearing that he found it odd that right away she's leaning over Amanda Sparrow. She's not allowing him to answer any of the officer's questions. He said in all of his years of experience in conducting traffic stops that he found it very strange that the passenger of the car would sort of take control of that stop such that the driver couldn't even answer a single question. We also have, before six minutes into the stop, that Officer Moore finds out that Amanda Sparrow is from a high crime neighborhood. All that opposing counsel points to is one instance in the trial record, not in the suppression record before the district court when it considered the motion to suppress. And in the trial record, we don't even have a conflict there. All we have is defense counsel asking the officer whether or not the Marion Street neighborhood and this stop six area are potentially different neighborhoods. And Officer Moore says yes. But that doesn't dispute the fact that the Marion Street neighborhood, Officer Moore believed to be a high crime neighborhood. So based on all of these factors, in Officer Moore's three years of experience as a police officer running thousands, he testified at the suppression hearing, running thousands of stops over those years, he had developed reasonable suspicion that criminal activity was likely that drugs were in the car by six minutes. So even if this court were to find that it wasn't reasonable for Officer Moore to not have rerun the license plate check, which is the government's position that he did not have to do it, there is no case law that requires him to do that, and we believe he acted reasonably in investigating that insurance issue. But even if this court disagrees with us on that point, he had developed reasonable suspicion that criminal activity was afoot by that six-minute mark. And thus he had the ability to hold the car under Terry and to continue to now investigate this new issue that had arisen of whether or not the Camaro was carrying drugs. And based on that, and then the factors that come out directly after that, the fact that soon after those six minutes he runs a criminal history check, he finds out that Barrow is on supervised release, he finds out that he has countless arrests for drug offenses, for evading arrest, for aggravated robbery, for gun offenses. The facts keep piling and piling up, Your Honor. But at the six-minute mark, the key mark that the opposing counsel points to, Officer Moore had a reasonable basis to extend the stop. Now, turning to Barrow's, unless the court has any further questions on the suppression issue, I'll turn to Barrow's two trial arguments. First, his spillover prejudice argument. Now, he argued today that he had no obligation, opposing counsel argued he had no obligation to object at trial in order to preserve this argument. And as we said in our brief, Your Honors, he just fundamentally misunderstands the impact of the court's suppression decision. That decision said that Mr. Barrow's Fourth Amendment rights were not violated and that the Rome traffic stop methamphetamine could be admitted in terms that it did not violate the Fourth Amendment. What the district court did not rule on, because Mr. Barrow and his counsel never raised this issue at trial, was whether or not there were any sort of other evidentiary issues with that evidence, namely whether the evidence was not relevant, whether it was substantially more prejudicial than probative under Rule 403. Mr. Barrow didn't make any of those arguments at trial, and thus he did not preserve that argument before you. So this claim is subject to plain error review, and under plain error review it fails at every single step. There was clearly no error here in not keeping out the evidence based on 401 and 403. Clearly the evidence of Mandis Barrow carrying large amounts of methamphetamine was not relevant to the proceeding indictment, but was relevant to count 1, the conspiracy count as well. So clearly there was no error, the district court made no error, definitely no clear or obvious error, in not sua sponte deciding to keep out the Rome traffic stop evidence based on Rules 401 or 403. And it did not impact Mr. Barrow's substantial rights under Prong 3, because he has not demonstrated that had the court excluded the Rome stop methamphetamine under Rules 401 or 403, he would not have been convicted on counts 1 or count 2 of the superseding indictment. Your Honors, on pages 46 to 48 of our brief, we detail the extensive evidence that was presented to the jury as it relates to counts 1, the conspiracy count, and count 2, a possession with intent to distribute count about a separate occasion, not the Rome traffic stop. And Your Honors, we would specifically point this court to Government's Exhibit 37, which was played in full to the jury. That's Mandus Barrow's confession to law enforcement after this separate December, late December of 2021. He comes in in December of 2021 and he confesses to law enforcement to being part of a conspiracy. He confesses to who was part of that conspiracy. He's able to detail the conspiracy in extreme detail from how the drugs are brought over from Mexico into the United States, how they're distributed and sold in the United States. He's also able to pinpoint where that other incident, the other drugs that were found in Vincente Chavez's house. He's able to identify the amounts of the drugs, the packaging of the drugs, the types of the drugs, and how those drugs were delivered to Vincente Chavez's house. That's the other possession count that was before the jury. So based on all of that evidence, it is clear that the jury had substantial evidence, would have convicted him of counts 1 and 2, even if this evidence of the Rome traffic stop had not been presented to them. So he has failed to establish any of the prongs under plain error view. Now, finally, turning to his last argument, his antagonistic defense argument, at the outset, Barrow frames this claim as a Sixth Amendment constitutional claim. It is not. As the Supreme Court in Zafiro versus United States and this court's case law have repeatedly held, an antagonistic defense claim is a claim about whether or not the district court erred in not separating two co-defendants' trials under federal rule of criminal procedure 14. So this is a claim about federal rule of criminal procedure 14. It's not a constitutional Sixth Amendment claim. Now, under that analysis, this court in repeated cases, including United States versus Hankton, has said that merely pointing the finger at a co-defendant does not rise to the level of an antagonistic defense claim. Here at closing argument, what you have was finger pointing. And opposing counsel's brief basically acknowledges that. It was Ms. Saldana's counsel standing up, the co-defendant's counsel, and saying that it was Mr. Barrow who knew about the drugs in the car, in the Camaro, during the Rome traffic stop. It was Mr. Barrow who placed them there, and that she had no idea about that. That's finger pointing, Your Honors, and that does not rise to the level of an antagonistic defense. The court could conclude its analysis there. But even if this court were to go further, in order, the Supreme Court in Zafiro and this court in multiple opinions has stated that in order to be considered an antagonistic defense, it has to be antagonistic to the point of irreconcilable, where those two defenses could not occur together. And here, these two defenses could be reconciled with one another. The jury could have believed both Mr. Barrow's defense and Ms. Saldana's defense. Her defense was she didn't know anything about the Rome traffic methamphetamine, that Mr. Barrow is the one who knew about that. Mr. Barrow's defense in closing argument wasn't that it was Ms. Saldana who knew about it. It was the officers didn't act, were not credible in this case. His counsel mentioned not credible or credibility eight times during closing argument. That was the crux of his argument. The officers were not credible in how they went about executing that Rome traffic stop. And it seemed to be some sort of a mens rea argument. Mr. Barrow's counsel didn't seem to be indicating a closing argument that he didn't know about the drugs or didn't put the drugs there, but rather that he didn't have the intent to distribute those drugs as is required to have convicted him on count three. So there weren't, uh, there is no evidence in the record that these closing arguments were mutually exclusive and thus his claim can also be denied on that basis. Moreover, the Supreme Court in Zafiro and this court again in countless cases has stated that the per se rule is defendants who are properly joined together when they're indicted should be tried together. And the Supreme Court in Zafiro noted that the way that you can avoid any sort of undue prejudice to a defendant by having his co-defendant present a mutually antagonistic defense is by jury instructions. Jury instructions that tell the jury to consider the counts against each defendant separately, uh, to weigh the evidence against each defendant separately. An instruction that, uh, attorney's arguments are not evidence and that they can't be considered as evidence. Those exact instructions, which this court in Daniels, this court in Matthews, this court in Mann has said cures any sort of potential prejudice to a defendant by a potential antagonistic defense. Those instructions were given here at ROA 483 and 493. So even if this court were to find that there were some sort of antagonistic defense issue here, which your honors, for all the reasons I've just explained and the reasons contained in our brief, we don't believe there are the jury instructions here cured any sort of prejudice under federal rule of procedure 14, any sort of prejudice that Mr. Barrow may have had. Unless the court has any further questions, we would ask this court to affirm the instructions. Excellent. Thank you, counsel. Mr. Elzo, you've saved five minutes for rebuttal. Very briefly, and unless there are questions, I don't suspect we'll be anywhere near that five minutes. Um, what is still out there is this idea of what happens at six minutes. You heard, um, again, that he had not reconciled the insurance issue at that point, but he chose a way to further investigate that, which confirmed what he was seeing, what was on the insurance card, the VIN three times. That was all resolved. That he chooses not to further investigate that is not a basis for prolonging this and questioning and continuing to ask questions, um, to develop reasonable suspicion at 15 and 16 minutes as we see laid out in the brief and what we heard from here again today. Um, again, there was some, uh, mention or reference to the fact that it's not our job or this court's job to look back and grade the paper, um, of a cop or a peace officer as to what was reasonable. Again, we use his words, not ours. Uh, again, if he would have done those things, he would have had the answer. He chose a different path. He still had the answer and we don't think that by just stopping the investigation that he can continue to extend it. We thank you for your courtesies here today and allowing us to be heard. Um, thank you, Mr. Elsa. Thank you. Um, the court notes that you are quote appointed and we are deeply grateful for your service to the court and the country, um, and your service to your client. We appreciate your candor with us today. Um, and thank you again for your presentation of an excellent argument. With that, the case is submitted and we will call the next case, which is case number 24.